[Cite as *State v. Kimmel*, 2026-Ohio-2821.]

COURT OF APPEALS OF OHIO

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

STATE OF OHIO,                                  :

    Plaintiff-Appellee,                      :

                                  No. 115669

    v.                                              :

BENJAMIN KIMMEL,                               :

    Defendant-Appellant.                     :

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 23, 2026

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-690271-A

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Alyssa Teetzel, Assistant Prosecuting Attorney, *for appellee.*

Joseph V. Pagano, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Appellant Benjamin Kimmel ("Kimmel") appeals his convictions and the denial of his motion to dismiss for an alleged speedy trial violation. For the reasons that follow, we affirm.

**Facts and Procedural History**

{¶ 2} On March 10, 2024, Kimmel was arrested for starting a fire in his apartment in Lakewood, Ohio. On March 18, 2024, Kimmel was indicted with seven counts of aggravated arson: one count pursuant to R.C. 2909.02(A)(2), a second-degree felony, and six counts pursuant to R.C. 2909.02(A)(1), first-degree felonies.

{¶ 3} On April 17, 2024, Kimmel requested that he be referred to the court's psychiatric clinic to assess his competence to stand trial. On August 9, 2024, the parties stipulated to the report of Dr. Jeff Rindsberg, who found Kimmel competent to stand trial. Seven continuances were then granted "at the request of [Kimmel]" because he was "awaiting discovery."

{¶ 4} On December 9, 2024, again at Kimmel's request, he was referred to the court's psychiatric clinic for another evaluation regarding his competency to stand trial. On January 30, 2025, a continuance was requested by Kimmel for new counsel, which was granted. On February 10, 2025, the State and Kimmel's counsel stipulated to a January 21, 2025, report finding Kimmel competent to proceed pro se and, at that point, Kimmel began representing himself. He also requested another continuance at this time as he was still awaiting discovery. Three more continuances were granted at the request of Kimmel including one because "[Kimmel] refused to come to court."

{¶ 5} On March 21, 2025, the court referred Kimmel to the court's psychiatric clinic for yet another competency evaluation. It was on March 24, 2025 that Kimmel filed a pro se motion as Ms. Cecilia Kimmel a.k.a. Ms. Benjamin Kimmel seeking

reinstatement of a previously granted personal recognizance bond. Three more continuances were requested by Kimmel. On May 21, 2025, Dr. Aileen M. Hernandez authored a report finding Kimmel competent to stand trial and able to proceed pro se in his defense.

{¶ 6} On June 6, 2025, the court again referred Kimmel to the court's psychiatric clinic for a competency evaluation "due to the behavior of [Kimmel] in the courtroom and a recent head injury[.]" On July 16, 2025, Dr. James R. Rodio authored a report finding Kimmel competent to stand trial and capable of acting pro se.

{¶ 7} On July 22, 2025, Kimmel filed a motion to dismiss his case for violation of his speedy trial rights under Ohio statutory law and the U.S. and Ohio Constitutions. The State opposed the motion, and, on August 4, 2025, the court denied the motion.

{¶ 8} Kimmel waived a trial by jury, and a bench trial commenced August 18, 2025. Kimmel proceeded pro se but had standby counsel with him. The State presented 14 witnesses and submitted 81 exhibits. After the State rested, it moved to dismiss Counts 6 and 7 as the alleged victims listed in said counts did not testify and there was no evidence presented regarding those counts. The court granted said motion. Kimmel then testified in his own defense.

{¶ 9} On August 28, 2025, the court issued a judgment entry finding Kimmel guilty of Counts 1 through 5 and sentenced Kimmel to a prison term of three to four and a half years.

{¶ 10} On September 5, 2025, Kimmel appealed raising the following three assignments of error for our review:

> **Assignment of Error I**: The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions for aggravated arson.

> **Assignment of Error II**: The convictions for aggravated arson are against the manifest weight of the evidence.

> **Assignment of Error III**: The trial court erred by denying appellant's motion to dismiss for violation of [appellant's] speedy trial rights under R.C. 2945.71, et seq. and in violation of appellant's constitutional rights.

**Trial Testimony**

{¶ 11} The following relevant testimony was presented at trial.

{¶ 12} The State presented three witnesses who were living at The Edge Apartments located at 11849 Clifton Boulevard ("The Edge") on March 10, 2024: Alfred Fingulin, Deric Blankenship and Hugh McKenna. All three witnesses testified consistently that, on the evening of March 9, 2024, they were in their apartments when they heard loud banging noises coming from Kimmel's apartment. Around 1 a.m. their smoke detectors went off, and smoke could be seen, and smelled, coming from the vents. They all immediately, and safely, exited the building.

{¶ 13} The State also put forth evidence that Anyeliz Birmingham was a tenant at The Edge and that she called 911 on March 10, 2024 reporting a fire at The Edge and later made a statement to police officers.

{¶ 14} The State presented the testimony of several Lakewood Police Department officers who investigated this case and interacted with Kimmel on March 10, 2024. Because Kimmel was the tenant of the apartment unit that was on fire at The Edge, he was a suspect and officers were searching for him that evening. The officers testified that Kimmel was found at the Regional Transit Authority ("RTA") West 117th – Madison station, a place officers often check for suspects because that is where people go when they are trying to flee the city. Kimmel was arrested at the RTA station where two socks were found and collected as evidence. The officers testified that when Kimmel was found, the sweater he was wearing had burn marks on a sleeve and he had singe marks in his hair and ash on his hands. Several officers testified that when asked if he was suicidal, Kimmel stated yes and he admitted that he started a fire earlier that evening to try and commit suicide.

### Jacqueline Ruchti

{¶ 15} Jacqueline Ruchti ("Ruchti") testified that she is a criminalist employed by the State Fire Marshal Forensic Lab where she analyzes fire debris, explosives, chemicals and other evidence. Ruchti received evidence in Kimmel's case and generated a laboratory report relating to her analyzing if any ignitable liquids were detected in the items. Of the nine items Ruchti tested, only items eight and nine, red and gray socks, tested positive for heavy petroleum distillate, which "can be things such as diesel fuel, kerosene, or other automotive fuel supplements."

**Jeffry Koehn**

{¶ 16} Jeffry Koehn ("Koehn") testified that he is employed with the State Fire Marshal's Fire and Explosion Investigations Bureau ("FEIB"). The FEIB responds to requests from agencies across Ohio including police and fire departments, coroners, prosecutors, Ohio State Highway Patrol and any government entity involving fires. Typically, once requested, Koehn will go to the scene first for an initial assessment. Koehn's job is to investigate the scene and identify the area of origin for the fire, what heat source caused the fire and whether it was accidental or intentional and then generate a report.

{¶ 17} Koehn's office was asked to investigate an apartment fire in Lakewood, Ohio in March 2024. Koehn generated a report of his investigation that included photographs of apartment C136's exterior and interior. Koehn was able to determine that the fire was not caused by the electrical box in the utility closet of the unit nor was it caused by a type of gas. Koehn was able to determine the origin of the fire based on where the damage from the fire was most severe. Koehn determined that the fire originated at the end of the hallway near the corner of the closet of apartment C136. Koehn determined that the fuel for the fire was the contents of the closet, including papers and books on the floor. Koehn collected evidence to be tested for ignitable liquids and stated that he would not have been surprised if there were no ignitable liquids present because there were enough combustible materials that an open flame from a match or lighter would have been sufficient to start the fire.

{¶ 18} Koehn noted smoke damage throughout the entire apartment building affecting eight units. The occupants of these units were unable to return to their apartments that night because of the smoke damage. Koehn testified that smoke is the "silent killer" because if you are sleeping, it can kill you as the carbon monoxide found in smoke is more of a sedative such that even without fire touching the units there was still risk because of the smoke.

{¶ 19} Koehn was able to speak with Kimmel at the Lakewood police station and asked Kimmel if he intentionally set the fire to kill himself and that Kimmel replied, "yes and no." Koehn testified that Kimmel then told him that the fire started inside Kimmel's apartment and Kimmel was inside the apartment at the time of the fire but left once it started. Kimmel told Koehn he started the fire as a result of careless smoking but admitted the fire was not accidental and started when Kimmel lit papers and clothing on fire in the hallway. Kimmel admitted he started the fire and that his clothing and hair were burned by the fire.

{¶ 20} Koehn's investigation, based on all the evidence collected and information available, determined that the fire was started intentionally by application of an open flame to available combustibles inside the hallway. It is unclear if any kind of ignitable liquid was used, but regardless, it was not necessary as the open flame to the combustibles was sufficient to start the fire.

{¶ 21} During Kimmel's cross-examination of Koehn, Kimmel asked if there was sufficient evidence to comport with the idea that there was a fire briefly started and then put out. Koehn responded, "No." Koehn testified that the fire spread down

the hallway, moved towards the kitchen, burned everything in that area along the ceiling and started to spread into the dining room before the fire department extinguished it. Koehn testified that it would have taken a couple of minutes for the fire to spread.

{¶ 22} There was no indication to Koehn during his investigation of apartment C136 that there was any attempt to extinguish the fire prior to the arrival of the fire department.

### Benjamin Kimmel

{¶ 23} Kimmel testified in his case-in-chief. Kimmel testified that he was home at the time of the fire on March 10 and stated that "I didn't set fire to the building. The fire had been accidental in nature resulting from a small . . . personal/recreational fire." Once he realized the fire was starting to spread out of control, he dumped a couple buckets of tap water on the blaze and thought he had extinguished the visible fire. He then had to leave the apartment because "there was too much toxic black smoke in [the] apartment to remain inside," and his skin had been burned. Kimmel decided he needed to go to MetroHealth for his injuries. Kimmel saw, as he was leaving the building, that one of his neighbors was yelling that there was a fire and making sure people were getting up. As he was walking off the property, he saw a fire truck pulling into the property. Kimmel then walked to the W. 117th – Madison RTA station. Kimmel testified that he was not "attempt[ing] to flee or evade capture" and was arrested at the RTA station by Lakewood police.

{¶ 24} Kimmel testified that there had been a tradition among his classmates at school to respond or cope with bad life circumstances by lighting one or more important things on fire to destroy them. On the night in question, Kimmel set books and clothing on fire on the floor of his closet. Kimmel opened all the windows in his apartment after starting the fire. Kimmel had set items on fire inside the apartment a few times within the previous year for the same "reason or for other reasons." He also testified that he had roasted nuts "a couple times" and had given them to his neighbors in his apartment complex. Kimmel testified that this time he failed to notice "that the fire was beginning to spread out of control until it was too late." Kimmel believed clothing he set on fire was made of material that resulted in "toxic black smoke" that had not occurred in his past fires. He had no reason to believe this fire would turn out differently than his previous fires, which had not caused any issues or complaints. One prior incident at that apartment was caused by a stovetop fire and resulted in Kimmel talking with the Lakewood Fire Department.

{¶ 25} Kimmel also testified that he had a black mold infestation as well as a natural gas leak in the apartment while living there at the time of the fire. Kimmel stated that for these reasons, and because of a bacterial infection of his testicle, his behavior at the time of the fire was atypical, and he "had not been in the habit of setting indoor fires prior to being at the complex[.]" Kimmel also testified that at the time of the fire he was on prescription medications. Kimmel testified to these

facts to "establish doubts to a reasonable person that" he would have set this fire intentionally.

**Law and Analysis**

### First Assignment of Error – Sufficiency of the Evidence

{¶ 26} In Kimmel's first assignment of error, he argues that the trial court erred when it denied his motion for acquittal pursuant to Crim.R. 29 because the State failed to present sufficient evidence to establish that he acted "knowingly" when committing these offenses. He also alleges there was insufficient evidence to sustain a conviction on Count 5 because the victim did not testify.

{¶ 27} As stated in *Westlake v. Y.O.*, 2019-Ohio-2432, ¶ 16 (8th Dist.):

> The test for sufficiency of the evidence requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Murphy*, 91 Ohio St.3d 516, 543, 2001- Ohio 112, 747 N.E.2d 765 (2001). "'The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Walker*, 150 Ohio St. 3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 12, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 28} As Kimmel acknowledges in his appellate brief, he failed to make a Crim.R. 29 motion for acquittal during trial so our review of this argument is limited to plain error. *E. Cleveland v. Thomas*, 2021-Ohio-2779, ¶ 10 (8th Dist.) ("Failure

to move for a judgment of acquittal waives all but plain error involving the sufficiency of the evidence.").

{¶ 29} Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Under Crim.R. 52(B), to find plain error three requirements must be met: "there was an obvious defect in the proceedings, the defect affected substantial rights, and the outcome of the trial would clearly have been different absent the error." *State v. Parker*, 2026-Ohio-346, ¶ 42 (8th Dist.), citing *State v. Barnes*, 2002-Ohio-68, ¶ 20. "Plain error is reserved for exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.*

{¶ 30} As such, we must assess whether the alleged insufficiency constitutes an obvious and prejudicial defect in the trial proceeding that affected a substantial right.

{¶ 31} We now turn to the evidence that was presented at trial to support Kimmel's convictions for aggravated arson.

{¶ 32} Kimmel was convicted of aggravated arson in violation of R.C. 2909.02(A)(1) and (A)(2) which states:

> (A) No person, by means of fire or explosion, shall knowingly do any of the following:
>
>> (1) Create a substantial risk of serious physical harm to any person other than the offender;
>>
>> (2) Cause physical harm to any occupied structure;
>
> . . .

As such, the State was required to present sufficient evidence that Kimmel, by means of fire, "knowingly" created a substantial risk of serious physical harm to any person and caused physical harm to an occupied structure to sustain the convictions.

{¶ 33} The mens rea requirement of "knowingly" is defined by statute:

> A person acts knowingly, *regardless of purpose*, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

R.C. 2901.22(B) (Emphasis added.) The "'mental element of knowledge does not require an inquiry into the purpose for an act, but involves the question of whether an individual is aware that his or her conduct will probably cause a certain result or will probably be of a certain nature.'" *State v. Wilson*, 2023-Ohio-1042, ¶ 31 (8th Dist.), quoting *In re F.D.*, 2015-Ohio-2405, ¶ 16 (8th Dist.). "'A defendant need not act with deliberate intent to act knowingly; if the result is probable, then the defendant acts with knowledge.'" *State v. Williams*, 2023-Ohio-4456, ¶ 19 (6th Dist.), quoting *State v. Kartman*, 2002-Ohio-5189, ¶ 8 (7th Dist.).

{¶ 34} In *State v. Graham*, 2025-Ohio-3134, ¶ 15 (9th Dist.), the court found that the State presented sufficient evidence of aggravated arson and that the defendant, by starting a fire hot enough to break windows and vent up to the roof and hallway while another individual was in the residence, created a substantial risk of serious physical harm to any person. Similarly, in *State v. Jones*, 2005-Ohio-768,

¶ 40 (4th Dist.), the court found that the evidence that the defendant "poured lighter fluid, set the fire, left the building and then returned to help his friends[]" is "sufficient for a reasonable trier of fact to conclude that the [defendant] knowingly set the fire and committed the crime" of aggravated arson.

{¶ 35} Upon review of the evidence presented at trial that is detailed above, we find that a reasonable finder of fact could find beyond a reasonable doubt that Kimmel was aware that his actions, to which he admitted, of lighting a large pile of clothes and books on fire in his apartment hallway would probably create a substantial risk of serious physical harm to the other occupants of the apartment complex and that this fire would probably cause physical harm to the occupied structure. Further, there is no dispute that the fire did cause physical harm to the occupied structure. The result of Kimmel's actions, i.e., that they would create a substantial risk of harm to others or cause physical harm to the occupied structure, was probable and therefore, Kimmel acted knowingly. As such, there was sufficient evidence at trial for a reasonable factfinder to conclude that Kimmel knowingly set the fire and created a substantial risk of harm to any person and caused physical harm to the occupied structure.

{¶ 36} Contrary to Kimmel's arguments in his brief that he need not have acted with the deliberate intent or purpose to harm anyone or thing with fire because the result of his actions was probable. Furthermore, Kimmel's arguments about his attempt to extinguish the fire or any of his actions after the fire was lit are irrelevant as to whether he acted knowingly.

{¶ 37} Similarly, we find there was sufficient evidence to support a conviction for Count 5 even though the victim did not testify. The State presented undisputed evidence that Birmingham lived at The Edge on March 10, 2024, in the same building as Kimmel, that she called 911 regarding the fire that night because she was concerned for her safety and that she also made a statement to police. As such, this is sufficient evidence to establish that she was in the building that night of the fire and that Kimmel, by means of fire, created a substantial risk of serious physical harm to her, just as he did to the other occupants of the building.

{¶ 38} Accordingly, because there was sufficient evidence, even if Kimmel had properly made a Crim.R. 29 motion for acquittal, it would not have been an error for the trial court to deny the motion. As such, we find there was no error here and our plain error analysis ends.

{¶ 39} Wherefore, Kimmel's first assignment of error is overruled.

**Second Assignment of Error – Manifest Weight**

{¶ 40} In his second assignment of error, Kimmel argues that his convictions are against the manifest weight of the evidence.

> To evaluate a claim that a jury verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial.

*State v. Wilks*, 2018-Ohio-1562, ¶ 168, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Reversing a conviction based upon the weight of the evidence should

occur "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 41} Kimmel argues that "[a]ll the same reasons that support dismissal of the convictions also support a finding that the convictions are against the manifest weight of the evidence." We assume that means Kimmel is arguing that the weight of evidence does not support a finding that Kimmel acted "knowingly," which is the argument he made in his first assignment error.

{¶ 42} Upon review, for the same reasons discussed above that support affirming his convictions because of sufficient evidence, we find that Kimmel's convictions are not against the manifest weight of the evidence. There was overwhelming, credible evidence presented that Kimmel "knowingly" started this fire on the floor in his apartment building. Kimmel admitted to lighting a large pile of clothes and books on fire in his apartment. The result of that behavior, that this would create a substantial risk of harm to anyone in the apartment building or cause physical harm to the occupied structure, is probable. This conclusively establishes Kimmel acted knowingly. Additionally, there was other credible evidence that Kimmel intentionally started the fire. Several police officers testified that Kimmel stated to them that he started the fire intentionally and Koehn's investigation revealed that the fire was started intentionally in Kimmel's apartment. Kimmel points to zero evidence presented at trial that contradicts that he acted "knowingly."

{¶ 43} Kimmel argues that his case is similar to *In re Horton*, 2005-Ohio-3502 (4th Dist.), which involved a minor who was adjudicated delinquent by act of aggravated arson. There the appellate court found that while the State presented sufficient evidence that the defendant "knowingly" caused the fire by lighting dozens of candles in her room the verdict was against the manifest weight of the evidence because the State failed to prove that the defendant "knowingly" started or accelerated the fire. However, *In re Horton* is not applicable here as the State presented abundant evidence that Kimmel started the fire and Kimmel's own testimony established that he started the fire.

{¶ 44} After reviewing the record, weighing the evidence and all the reasonable inferences and considering the credibility of the witnesses, we cannot conclude Kimmel's convictions for aggravated arson are against the manifest weight of the evidence.

{¶ 45} Kimmel's second assignment of error is overruled.

**Third Assignment of Error – Speedy Trial Violation**

{¶ 46} In his third assignment of error, Kimmel argues that the trial court erred when it denied his motion to dismiss the charges against him for violating his speedy trial rights pursuant to R.C. 2945.71(C), the Sixth Amendment of the U.S. Constitution and Section 10, Article 1 of the Ohio Constitution. We address his statutory argument first and then his constitutional argument.

{¶ 47} As stated in *State v. Pirkel*, 2010-Ohio-1858, ¶ 7 (8th Dist.):

The Sixth Amendment of the United States Constitution and Section 10, Article I of the Ohio Constitution guarantee an accused the right to a speedy and public trial. *State v. Ginley*, Cuyahoga App. No. 90724, 2009 Ohio 30. In *Barker v. Wingo* (1972), 407 U.S. 514, 523, 92 S.Ct. 2182, 33 L.Ed.2d 101, the United States Supreme Court declared that, with regard to fixing a time frame for speedy trials, "the States . . . are free to prescribe a reasonable period consistent with constitutional standards . . . ." To that end, the Ohio General Assembly enacted R.C. 2945.71 in order to comply with the *Barker* decision

{¶ 48} R.C. 2945.73 provides as follows: "(B)(1) Upon motion made at or prior to the commencement of trial, a person charged with an offense shall be discharged if he is not brought to trial within the time required by sections 2945.71 and 2945.72 of the Revised Code." R.C. 2945.71(C) provides in pertinent part: "A person against whom a charge of felony is pending . . . shall be brought to trial within two hundred seventy days after the person's arrest." Relevant to this appeal, Section (E) states that "[f]or purposes of computing time under divisions (A), (B), (C)(2), and (D) of this section, each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days." "Thus 90 days time in jail would equate to 270 days using the triple-count provision." *Pirkel* at ¶ 8.

{¶ 49} "Our standard of review upon an appeal raising a speedy trial issue is to simply count the days as directed in R.C. 2945.71 et seq." *Cleveland v. Pangrace*, 2007-Ohio-6321, ¶ 9 (8th Dist.). "Where we find ambiguity, we construe the record in favor of the accused." *Id.*

{¶ 50} The record demonstrates that Kimmel was arrested on March 10, 2024. For purposes of speedy trial computation, time starts to run the day after the arrest. *Id.* at ¶ 16. Thus, we begin counting on March 11, 2024. Kimmel was tried

on August 18, 2025. The total number of days between arrest and trial is 525 days, which is clearly beyond the 270 days prescribed by R.C. 2945.71(C). "Once the statutory limit has expired, the defendant has established a prima facie case for dismissal." *Pirkel* at ¶ 9. "At that point, the burden shifts to the state to demonstrate that sufficient time was tolled pursuant to R.C. 2945.72." *Id.*

{¶ 51} R.C. 2945.72 specifies the only permissible reasons for which a trial court may extend the limits of R.C. 2945.71 and states in relevant part:

> The time within which an accused must be brought to trial or, in the case of felony, to preliminary hearing and trial, may be extended only by the following:
>
> . . .
>
> (B) Any period during which the accused is mentally incompetent to stand trial or during which the accused's mental competence to stand trial is being determined, or any period during which the accused is physically incapable of standing trial;
>
> (C) Any period of delay necessitated by the accused's lack of counsel, provided that such delay is not occasioned by any lack of diligence in providing counsel to an indigent accused upon the accused's request as required by law;
>
> (E) Any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused;
>
> . . .
>
> (H) The period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion . . . .

R.C. 2945.72(E) permits the tolling of time when a defendant files a motion to dismiss for speedy trial violations and when a defendant makes a demand for discovery. *Pangrace* at ¶ 26, 29.

{¶ 52} We now turn to a review of the docket in this case to count the speedy trial days. The docket reflects that between March 11, 2024 (day after date of arrest) and March 25, 2024 (day Kimmel filed a demand for discovery) is 14 days, which must be multiplied by three pursuant to R.C. 2945.71(E) and, therefore, counts as 42 speedy trial days. Kimmel's request for discovery began a tolling period that included his request for a continuance and for a competency evaluation. R.C. 2945.72(B). The trial court ordered Kimmel to Northcoast Behavioral Healthcare ("NCBH") on June 17, 2024. On August 9, 2024, Kimmel was returned from NCBH and found competent, ergo speedy trial days begin again and count until August 22, 2024, when Kimmel requested another continuance. R.C. 2945.72(H). That is 13 days multiplied by three so 39 speedy trial days were accumulated. Kimmel then requested seven continuances for "awaiting discovery" and "ongoing plea negotiations." R.C. 2945.72(E) and (H). The speedy trial calculation begins again on November 13, 2024, when a pretrial was held and continues until December 9, 2024, when Kimmel again requested a psychiatric evaluation to determine his competency and to represent himself pro se. R.C. 2945.72(B). We note that on November 6, 2024, Kimmel posted bond and was no longer in jail. As such the time between November 13, 2024, and November 25, 2024, is 12 days which are multiplied by three for 36 speedy trial days and the time between November 26,

2024, and December 9, 2024, is another 13 days which are not multiplied by three because Kimmel was no longer in custody and therefore a total of 49 speedy trial days were accumulated.

{¶ 53} The psychiatric evaluation on December 9, 2024 begins another tolling period that continues until June 5, 2025. R.C. 2945.72(B). During that time Kimmel also requested continuances for new counsel and to await and exchange discovery and a continuance was granted because Kimmel refused to come to court and another psychiatric evaluation was requested. R.C. 2945.72(B), (C) and (E). On June 5, 2025 Kimmel was in court for a pretrial and as a result of his behavior in court on June 6, 2025 the court sua sponte referred Kimmel for yet another psychiatric evaluation. It is unclear from the docket if Kimmel was in custody, so we construe this ambiguity in Kimmel's favor and assume he was such that this one day is multiplied by three so three speedy trial days were accumulated.

{¶ 54} Another tolling period occurs during this psychiatric evaluation, and on July 22, 2024 at the next hearing, after Kimmel was found competent and able to continue representing himself, he filed a motion to dismiss which continues the tolling period. R.C. 2945.72(E). The motion to dismiss was denied on August 4, 2025 and Kimmel's trial began on August 18, 2025, which is 14 days multiplied by three so that is an additional 42 speedy trial days. As such, based on this court's calculation, Kimmel accumulated 175 total speedy trial days, which does not surpass the 270-day deadline dictated in R.C. 2945.71(C). Therefore, Kimmel's statutory speedy trial right was not violated.

{¶ 55} We now turn to Kimmel's alleged constitutional speedy trial violation. We note at the onset that "[a] defendant's constitutional speedy-trial rights under the United States and Ohio Constitutions are 'essentially equivalent.'" *State v. Slater*, 2023-Ohio-608, ¶ 14 (8th Dist.).

{¶ 56} Because the facts are undisputed and the trial court made no findings, our standard of review here is de novo. *State v. Barnes*, 2008-Ohio-5472, ¶ 19 (8th Dist.). "In examining a constitutional claim on speedy trial grounds, the statutory time requirements of R.C. 2945.71 to 2945.73 are not relevant; instead, courts should employ the balancing test enunciated by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)." *State v. Cochern*, 2018-Ohio-265, ¶ 47 (8th Dist.), citing *Barnes* at ¶ 28. The United States Supreme Court identified the balancing test factors as: 1) the length of the delay; 2) the reason the government assigns to justify the delay; 3) whether and how the defendant asserts his right; and 4) prejudice to the defendant. *Barker* at 531-532.

{¶ 57} Applying the factors, we note that the length of the delay is 525 days, which is presumptively prejudicial. *State v. Long*, 2020-Ohio-5363, ¶ 14 ("Generally, a delay that approaches one year is presumptively prejudicial."). This factor weighs in favor of Kimmel. The second factor, however, weighs strongly in favor of the State since the vast majority of the delay in this case is attributable to Kimmel as it was necessitated almost entirely by his requests for continuances and psychiatric evaluations to stand trial and represent himself.

{¶ 58} Considering the third factor, we note that while Kimmel did file a motion to dismiss alleging a violation of Ohio's Speedy Trial Act, he did not in said motion allege or argue violations of his rights under the Sixth Amendment of the U.S. Constitution and Section 10, Article 1 of the Ohio Constitution. However, because he did raise the issue, this factor will be weighed slightly in Kimmel's favor.

{¶ 59} Last, we consider the fourth factor, prejudice to Kimmel. "The prejudice factor in the analysis 'should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect.'" *Long* at ¶ 22, quoting *Barker*, 407 U.S. at 532. "The three interests are '(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.' . . . The third interest warrants special emphasis because prejudice in that context 'skews the fairness of the entire system." *Id.* "The relevant prejudice inquiry looks at the conditions and circumstances of the delay before trial." *Long* at ¶ 25. "In other words, 'under the prejudice inquiry, we look at the portion of the delay that is attributable to the government.'" *Slater*, 2023-Ohio-608, at ¶ 51, quoting *Long* at ¶ 70 (DeWine, J., dissenting), citing *Barker* at 533-534.

{¶ 60} Kimmel generally asserts he was prejudiced "by the court's denial of [his motion] as [he] remained incarcerated." We assume Kimmel is arguing this prejudice is related to the first interest in the fourth factor that his pretrial incarceration was oppressive. Kimmel makes no arguments in his brief that he experienced anxiety and was concerned. Furthermore, Kimmel does not assert any

particularized nonspeculative prejudice relating to the impairment of his defense such as the delay hindered his ability to gather evidence, contact witnesses or prepare for his defense.

{¶ 61} We find that Kimmel fails to demonstrate that he was prejudiced. *See State v. Jones*, 2021-Ohio-3359, ¶ 27 (8th Dist.) (finding defendant failed to show any reasonable prejudice by failing to identify how the delay hindered his ability to gather evidence, contact witnesses or prepare for his defense). As discussed above, almost the entirety of the delay Kimmel experienced was attributable to him. In the absence of any alleged actual prejudice, we do not find the delay attributable to the State here to have prejudiced Kimmel.

{¶ 62} Balancing the *Barker* factors, we find no violation of Kimmel's constitutional speedy trial right. While the first and third factors weigh in favor of Kimmel, they do not outweigh the second and fourth factors. The length of the delay does not outweigh the fact that most of the delay was attributable to Kimmel and that no particular prejudice to his defense was shown. *See Slater*, 2023-Ohio-608, at ¶ 52 (The court balanced the *Barker* factors and found no violation when "[t]he length of the delay is not excessive enough to outweigh Slater's failure to assert his rights, especially where the delay was mostly attributable to Slater and no particular prejudice to the defense was shown.").

{¶ 63} In *State v. Miller*, 2021-Ohio-2924, ¶ 46 (8th Dist.), this court similarly found no constitutional violation of the defendant's speedy trial right as the delays were occasioned by continuances requested by the defendant moving for

psychiatric examinations and for the right to proceed pro se, amongst other things. The defendant also failed to produce any argument or evidence to show the continuances were unreasonable. *Id.*

{¶ 64} As such, because we find no statutory or constitutional violation of his speedy trial rights, Kimmel's third assignment of error is overruled.

{¶ 65} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

MICHAEL JOHN RYAN, P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR